KING, JUSTICE, DISSENTING:
 

 ¶ 28. In wrongful-death actions sounding in medical negligence, the statute of limitations for survival claims does not begin to run until the patient reasonably can be held to have known of the causative relationship between her injury and the conduct of the medical practitioner.
 
 Neglen v. Breazeale
 
 ,
 
 945 So.2d 988
 
 , 990 (Miss. 2006) (citations omitted). The autopsy report in this case definitively revealed for the first time that the patient's neurological injury had resulted from the rapid correction of her sodium levels after a period of severe hyponatremia. No doctor accurately had diagnosed the cause of the patient's injury during her lifetime. In fact, two medical specialists stated that her injuries had not resulted from the treatment of her hyponatremia. Because no doctor accurately had diagnosed the cause of Shirley Pollan's (Shirley) neurological deficits and because specialists in the field explicitly had denied a causative relationship between her medical treatment and injuries, I dissent from the majority's finding that Pollan's survival claims were barred by the statute of limitations.
 

 ¶ 29. Pursuant to Mississippi Code Section 15-1-36(2), claims for survival are barred unless brought within two years from the date the alleged act was or with reasonable diligence should have been first
 discovered.
 
 Miss. Code Ann. § 15-1-36
 
 (2) (Rev. 2012). The "statute of limitations begins to run when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner."
 
 Neglen v. Breazeale
 
 ,
 
 945 So.2d 988
 
 , 990 (Miss. 2006) (citations omitted). So, until the plaintiff "(1) has knowledge of the injury, (2) has knowledge of the cause of the injury, and (3) knows the relationship between the practitioner and the injury," the discovery rule is tolled.
 
 Stringer v. Trapp
 
 ,
 
 30 So.3d 339
 
 , 342 (Miss. 2010) (citation omitted).
 

 ¶ 30. Here, Shirley's family diligently attempted to determine the cause of Shirley's condition after her bout with severe hyponatremia. Shirley's family transferred her from NMMC-West Point to NMMC-Tupelo, where her treating physicians at NMMC-Tupelo were perplexed as to Shirley's mental status changes. Shirley's chart stated:
 

 IMPRESSION: Mental status changes/neurologic changes. Worried about the possibility of fluid shifts within the brain with these low sodiums versus a cerebrovascular accident.
 

 Thus, the doctors were concerned that Shirley's neurologic changes might have resulted from a cerebrovascular accident-a stroke. One of Shirley's physicians ordered an MRI scan to see any evidence of central pontine myelinolysis (CPM) in Shirley's brain stem. The MRI revealed no demyelination in the brain stem. On October 12, 2008, Shirley's chart stated that CPM could have a delay in showing up on an MRI and stated that another MRI should be taken in forty-eight hours to a week.
 

 ¶ 31. Shirley returned to NMMC-Tupelo on October 19 and was diagnosed with a behavior disorder. On October 21, Dr. Loden stated that he was "very perplexed as to whether this is organic from her recent sodium swings or whether it may be a new psych issue. She certainly has some psychotic type features." Shirley had a repeat MRI. The MRI again showed no sign of CPM. Shirley's following medical visits included diagnoses of delirium, anxiety, and bipolar disorder. Thus, in her barrage of doctors' visits following her episode of severe hyponatremia, Shirley's health-care providers treated her for bipolar disorder and anxiety, not for CPM.
 

 ¶ 32. Moreover, two of Shirley's treating physicians had ruled out CPM as a cause. Dr. Feiyu Chen, a recommended physician specializing in the field of neurology, specifically stated that he did not think Shirley had CPM. And Dr. John Brockington opined that, "[t]he pons does not appear to be involved, but I do think that the patient's cognitive impairment is directly due to the effects of the hyponatremia...." Dr. Brockington, another specialist in the field, did not state that Shirley's mental condition had been the result of the
 
 treatment
 
 of her hyponatremia, but instead attributed her condition to the hyponatremia itself. Shirley was admitted to Baptist shortly after her visit with Dr. Brockington. Her chart stated, "[a]pparently multiple scans were done and were reviewed by neurology and felt as though the patient had develop[ed] permanent cerebral damage possibly related to her severe electrolyte abnormalities in October of 2008." Again, her chart did not state that Shirley's neurological deficits had been caused by the treatment of her hyponatremia, but instead was "related to her severe electrolyte abnormalities." Accordingly, I believe that Shirley was entitled to rely on her physicians' opinions that she did not have CPM.
 

 ¶ 33. "[I]n Mississippi, when a valid factual dispute exists, the issue is settled by
 the finder of fact, a jury. It is only when reasonable minds cannot differ that it becomes settled as a matter of law."
 
 Huss
 
 ,
 
 991 So.2d at
 
 166 ;
 
 see also
 

 Holaday v. Moore
 
 ,
 
 169 So.3d 847
 
 , 850 (Miss. 2015) ("This Court has held that '[d]iscovery of an injury "is an issue of fact to be decided by a jury when there is a genuine dispute." ' "). The statute of limitations has been tolled in cases in which a patient develops serious complications after a medical procedure but has no reason to know that the doctor's negligence in performing the procedure caused the complications.
 
 Huss v. Gayden
 
 ,
 
 991 So.2d 162
 
 , 166 (Miss. 2008) (quoting
 
 Sutherland v. Estate of Ritter
 
 ,
 
 959 So.2d 1004
 
 , 1008 (Miss. 2007) ). There, this Court explained that a statute of limitations also may be tolled upon reasonable reliance on a physician's estimate and/or opinion as to recovery or risk.
 
 Id.
 
 at 167. As this Court has held, "a layperson undergoing a surgical procedure trusts in and relies on the instructions, professional expertise and guidance of his or her physician."
 
 Neglen
 
 ,
 
 945 So.2d at 991
 
 ("[W]e cannot conclude as a matter of law that Lillian did not act diligently by trusting the doctors' opinions and waiting over two years before requesting James'[s] medical records.").
 

 ¶ 34. If even medical doctors specializing in the particular field could not determine whether Shirley's neurological changes resulted from her severe hyponatremia or from the results of her treatment of hyponatremia or from some other cause, a jury question exists as to whether Shirley should have known of her neurological injuries and the correlation to the treatment of her hyponatremia. Had Pollan filed a lawsuit before the autopsy report revealed that Shirley's cause of death was CPM, Shirley's own physicians' opinions would have been that she did not have CPM. Based on the medical opinions that Shirley had been provided at that point, a jury question would have existed as to whether Shirley had been injured from her treatment at all, or if her neurological deficits had been the result of her sodium depletion itself or from another unknown cause.
 

 ¶ 35. Although the majority cites
 
 Sutherland
 
 ,
 
 959 So.2d at 1004
 
 , this case clearly can be distinguished. There, the plaintiff had experienced negative side effects after taking Zyprexa.
 

 Id.
 

 at 1005
 
 . The plaintiff admittedly knew that his injuries directly resulted from taking Zyprexa, but he did not know the specific medical terminology for his condition.
 

 Id.
 

 at 1007
 
 . The facts showed that the plaintiff had known "who, when, how, and by what he had been injured soon after receiving treatment...."
 

 Id.
 

 However, this Court emphasized that:
 

 [I]n medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, should have first discovered the negligence, rather than the injury.... For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However, if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.
 

 Id.
 

 at 1008
 
 .
 

 36.¶ Pollan signed an affidavit stating that Shirley's doctors never had advised Shirley that her post-October 8, 2008, conditions were the result of her past medical treatment. Pollan also swore that her doctors had not advised him that she had been suffering from CPM due to rapid sodium correction. Pollan has shown a genuine issue of material fact as to when Shirley or her family should have discovered "the injury itself, the cause of the injury, and the causative relationship between the injury
 and the conduct of the medical practitioner."
 
 Neglen
 
 ,
 
 945 So.2d at 990
 
 . After a myriad of physicians and appointments, no doctor definitively stated that Shirley had developed CPM. Because I believe that genuine issues of material fact remain on the question of whether Shirley should have known of the correlation between her treatment on October 8, 2008, and her resulting injury, I would reverse the decision of the circuit court and remand for a trial on the merits. Therefore, I dissent.
 

 KITCHENS, P.J., AND ISHEE J., JOIN THIS OPINION.